ORIGINAL

Approved: _SARAH KRISSOFF_ (signature)
SARAH KRISSOFF
Assistant United States Attorney

Before:    THE HONORABLE JAMES L. COTT
           United States Magistrate Judge
           Southern District of New York

- - - - - - - - - - - - - - - - - - X
                                     :   COMPLAINT
UNITED STATES OF AMERICA             :
                                         Violations of
         - v. -                      :   18 U.S.C. §§ 1951,
                                         924(c)(1)(A)(i), and 2
ROBERT PENA,                         :
     a/k/a "Chapi,"                      COUNTY OF OFFENSE:
JOSE MARTINEZ-RENTAS,                :   BRONX
     a/k/a "El Bori,"
NELSON ALMANZAR,                     :
     a/k/a "Hormiga, and
ANDRES MARTINEZ-RENTAS,              :

              Defendants.            :

- - - - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

    OSCAR RIVAS, being duly sworn, deposes and says that he is a Task Force Officer with the Drug Enforcement Administration ("DEA"), and charges as follows:

**COUNT ONE**
(Conspiracy to Commit Hobbs Act Robbery)

    1.   From in or about June 2018 to in or about July 2018, in the Southern District of New York and elsewhere, ROBERT PENA, a/k/a "Chapi," JOSE MARTINEZ-RENTAS, a/k/a "El Bori," NELSON ALMANZAR, a/k/a "Hormiga," and ANDRES MARTINEZ-RENTAS, the defendants, and others known and unknown, unlawfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit robbery, as that term is defined in Title 18, United States Code, Section 1951(b)(1), and would and did thereby obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3),

to wit, PENA, JOSE MARTINEZ-RENTAS, ALMANZAR, and ANDRES MARTINEZ-RENTAS, conspired to commit an armed robbery of individuals believed to be engaged in narcotics trafficking in the Bronx, New York.

(Title 18, United States Code, Section 1951.)

### COUNT TWO
(Attempted Hobbs Act Robbery)

2. On or about July 25, 2018, in the Southern District of New York and elsewhere, ROBERT PENA, a/k/a "Chapi," JOSE MARTINEZ-RENTAS, a/k/a "El Bori," NELSON ALMANZAR, a/k/a "Hormiga," and ANDRES MARTINEZ-RENTAS, the defendants, unlawfully and knowingly did attempt to commit robbery, as that term is defined in Title 18, United States Code, Section 1951(b)(1), and would and did thereby obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3), to wit, PENA, JOSE MARTINEZ-RENTAS, ALMANZAR, and ANDRES MARTINEZ-RENTAS attempted to commit an armed robbery of individuals believed to be engaged in narcotics trafficking in the Bronx, New York and aided and abetted the same.

(Title 18, United States Code, Sections 1951 and 2.)

### COUNT THREE
(Use, Carrying, and Possession of a Firearm)

3. On or about July 25, 2018, in the Southern District of New York and elsewhere, ROBERT PENA, a/k/a "Chapi," JOSE MARTINEZ-RENTAS, a/k/a "El Bori," NELSON ALMANZAR, a/k/a "Hormiga," and ANDRES MARTINEZ-RENTAS, the defendants, during and in relation to a crime of violence for which they may be prosecuted in a court of the United States, namely, the attempted robbery charged in Count Two of this Complaint, knowingly did use and carry a firearm, and, in furtherance of such crime, did possess a firearm, and did aid and abet the use, carrying, and possession of a firearm.

(Title 18, United States Code, Sections 924(c)(1)(A)(i) and 2.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

4. I am a Task Force Officer with the DEA. This affidavit is based on my personal participation in the investigation of this matter, my conversations with other law enforcement agents, witnesses and others, my review of recordings, and my examination of reports and records. During my employment with the NYPD and the DEA, I have participated in numerous investigations of armed robberies and home invasions. During the course of these investigations, I have conducted or participated in surveillance, the introduction of undercover agents, the execution of search warrants, and debriefings of informants. Through my training, education, and experience, I have become familiar with (1) the various ways in which robbers commit robberies, homicides, and other offenses; (2) the typical methods used to commit robberies and similar offenses; (3) the types of efforts commonly undertaken by persons involved in such activities to avoid detection by law enforcement; and (4) the manner in which firearms are typically used in connection with such criminal activity. I speak Spanish fluently. Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

5. On or about June 7, 2018, at the direction of law enforcement, two Confidential Sources ("CS-1" and "CS-2")[1] met with ROBERT PENA, a/k/a "Chapi," the defendant, in the Bronx, New York.[2] I and other agents surveilled this meeting, which was also recorded by CS-1.[3] During this meeting, CS-2 introduced CS-

---

[1] Both CS-1 and CS-2 are paid for their information. Information provided to date by both CS-1 and CS-2 in this investigation has proven reliable, and has been corroborated by other independent means, such as agent surveillance and recorded conversations and meetings.

[2] Prior to this June 7, 2018 meeting, PENA stated to CS-2, among other things, that PENA had previously committed robberies of drug dealers. After CS-2 reported PENA's statements to law enforcement, law enforcement arranged for CS-2 to meet with PENA on June 7, 2018 and to introduce PENA to CS-1.

[3] Generally, the discussions during the calls and meetings set forth herein took place in Spanish. I listened in on many of the calls described herein. In addition, CS-1 was equipped

3

1 to PENA, and discussed committing a drug robbery in the future. Based on my observations on surveillance, my debriefing of CS-1 after the meeting, and my review of the recording made during the meeting, I have learned, in substance and in part, that during this meeting, CS-1, CS-2, and PENA discussed committing a drug robbery targeting kilogram quantities of cocaine. Among other things, PENA indicated, in substance and in part, that he would bring two other individuals to participate in the robbery, and that he knew to come prepared to commit the robbery with firearms.

6. Shortly after the meeting, on or about June 7, 2018, ROBERT PENA, a/k/a "Chapi," the defendant, called CS-1. This call was recorded. Based on my review of the recording, and my conversations with CS-1, I know that during the call, among other things, PENA told CS-1, in substance and in part, that if CS-1 came across any work (which, I know, from my training, experience, and involvement in this investigation, to be a reference to drugs), CS-1 should think of PENA. PENA explained that he would get rid of the product by taking it upstate.

7. On or about June 8, 2018, ROBERT PENA, a/k/a "Chapi," the defendant, had several calls with CS-1. I have reviewed the recordings of these calls, and have discussed these calls with CS-1. Based on my review of the recordings and my discussions with CS-1, I know that, during these calls, among other things, in substance and in part: (1) PENA indicated he knew someone who had a half a kilogram of heroin available to sell, if CS-1 was interested; and (2) CS-1 and PENA discussed the future drug robbery, including who was going to participate in the robbery and how they would distribute the drugs obtained through the robbery.

8. On or about June 11, 12, and 13, 2018, ROBERT PENA, a/k/a "Chapi," the defendant, had several calls with CS-1. I have reviewed the recordings of these calls, and have discussed these calls with CS-1. Based on my review of the recordings and my discussions with CS-1, I know that, during these calls, among other things, in substance and in part, PENA and CS-1 discussed

---

with a transmitter during the meeting on or about June 7, 2018, and all of the meetings set forth herein, in an effort to enable the law enforcement officers surveilling the meetings to listen to the events on a real-time basis. Due to the nature of the transmitter, and the need for the surveillance team to keep some distance from CS-1 during the meetings, the transmissions were intermittent.

4

who was going to participate in the planed drug robbery, and how PENA would provide a car to use for the robbery.

9. On or about July 9, 2018, at the direction of law enforcement, CS-1 met with ROBERT PENA, a/k/a "Chapi," the defendant, in the Bronx, New York. The meeting was arranged through a telephone call between CS-1 and PENA. CS-1 was equipped with a recording device during the meeting. Based on my observations on surveillance, my debriefing of CS-1 after the meeting, and my review of the recording made during the meeting, I have learned, in substance and in part, that the following took place during the meeting:

   a. PENA and CS-1 first met with NELSON ALMANZAR, a/k/a "Hormiga," the defendant, and discussed the details of the planned drug robbery. In substance and in part, during discussions about how the planned robbery would be carried out (1) CS-1 informed PENA and ALMANZAR that the target of the robbery would be an Ecuadorian connection delivering kilograms of cocaine and heroin from Baltimore to CS-1 in New York City; (2) PENA and ALMANZAR stated that they would provide the vehicle to commit the robbery; (3) ALMANZAR indicated that he would bring a small firearm to the robbery to scare the victims; and (4) the men agreed upon the division of the drugs to be obtained from the planned robbery. ALMANZAR also provided his cell phone number to CS-1.

   b. PENA and CS-1 then met with JOSE MARTINEZ-RENTAS, a/k/a "El Bori," the defendant, and further discussed the details of the planned drug robbery. In substance and in part, during discussions about how the planned robbery would be carried out (1) CS-1 informed JOSE MARTINEZ-RENTAS that the target of the robbery was approximately 7 kilograms of cocaine and 5 kilograms of heroin that was being delivered from Baltimore to CS-1 in New York City; (2) JOSE MARTINEZ-RENTAS stated that they did not need to worry about obtaining guns for the robbery, because he had three guns available; (3) JOSE MARTINEZ-RENTAS stated that he wanted to bring a friend with him to do the robbery, because his friend had a car available and also had the guns; (4) JOSE MARTINEZ-RENTAS stated that he used to do narcotics-related robberies in Puerto Rico; and (5) the men agreed upon the division of the drugs to be obtained from the planned robbery.

   c. In addition, during the meeting, in substance and in part, JOSE MARTINEZ-RENTAS spoke about a Mexican man who works in construction and often has a large amount of cash on him to pay construction workers. JOSE MARTINEZ-RENTAS explained that he and his friend were currently conducting surveillance of the Mexican

man, and were planning on robbing him. MARTINEZ-RENTAS also provided his cell phone number to CS-1.

10. On or about July 10, 2018, CS-1 spoke with JOSE MARTINEZ-RENTAS, a/k/a "El Bori," the defendant, over the phone. This call was recorded. Based on my review of the recording of the call, as well as my discussions with CS-1, I know that, during this call, among other things, in substance and in part, JOSE MARTINEZ-RENTAS told CS-1 that JOSE MARTINEZ-RENTAS was ready to do the planned drug robbery, and that JOSE MARTINEZ-RENTAS needed someone like CS-1 to assist him with the robbery of the Mexican guy.

11. On or about July 12, 2018, at the direction of law enforcement, CS-1 met with ROBERT PENA, a/k/a "Chapi," JOSE MARTINEZ-RENTAS, a/k/a "El Bori," and NELSON ALMANZAR, a/k/a "Hormiga," the defendants, in the Bronx, New York. CS-1 was equipped with a recording device during the meeting, and I and other law enforcement officers conducted surveillance during the meeting. Based on my observations on surveillance, my debriefing of CS-1 after the meeting, and my review of the recording made during the meeting, I have learned, in substance and in part, that the following took place during the meeting:

    a. The men discussed the planned drug robbery and the roles that each individual would play in the robbery. In substance and in part, during discussions about how the planned robbery of the truck delivering the drugs to CS-1 would be carried out, it was decided (1) that PENA would get the drugs while JOSE MARTINEZ-RENTAS and ALMANZAR held the victims at gunpoint; (2) that JOSE MARTINEZ-RENTAS would bring a friend to drive the car, as well as a gun for the driver to use and a second gun for JOSE MARTINEZ-RENTAS to use; (3) that JOSE MARTINEZ-RENTAS wanted to hit one of the victims in order to show that the men meant business; and (4) that ALMANZAR would bring his own gun to the robbery.

    b. During the meeting, in substance and in part, ALMANZAR also spoke about a prior narcotics-related robbery during which ALMANZAR put the gun in a victim's mouth.

12. On or about July 21, 2018, CS-1 spoke with NELSON ALMANZAR, a/k/a "Hormiga," the defendant. This call was recorded. Based on my discussions with CS-1,[4] I know that, during this call, in substance and in part, ALMANZAR told CS-1 that ALMANZAR was ready to do the planned drug robbery.

---

[4] I have not yet reviewed the recording of this call.

13.     On or about July 24, 2018, CS-1 attempted to reach ROBERT PENA, a/k/a "Chapi," the defendant, via telephone, but was unable to do so. CS-1 then spoke with NELSON ALMANZAR, a/k/a "Hormiga," the defendant, on the phone. This call was recorded. Based on my discussions with CS-1,[5] I know that, during this call, among other things, in substance and in part, CS-1 and ALMANZAR spoke about the planned robbery, and ALMANZAR expressed concern that PENA was not reliable. ALMANZAR stated that he was going to get another person to participate in the robbery ("UM-1"), and CS-1 and ALMANZAR then made plans to meet.

14.     Subsequently, on or about July 24, 2018, at the direction of law enforcement, CS-1 met with NELSON ALMANZAR, a/k/a "Hormiga," and UM-1 in the Bronx. CS-1 was equipped with a recording device during the meeting, and I and other law enforcement officers conducted surveillance during the meeting. Based on my observations on surveillance, and my debriefing of CS-1 after the meeting,[6] I have learned, among other things, in substance and in part, that during the meeting, the men discussed the planned drug robbery of the truck delivering the kilograms of cocaine and heroin to CS-1, which they understood was going to take place the next day, and the need to be armed during the robbery. UM-1 claimed that he was very experienced in conducting such robberies.

15.     On or about July 24, 2018, CS-1 also spoke with JOSE MARTINEZ-RENTAS, a/k/a "El Bori," the defendant, over the phone. This call was recorded. Based on my discussions with CS-1, I know that, during this call, JOSE MARTINEZ-RENTAS and CS-1 made arrangements to meet.[7] Subsequently, on or about July 24, 2018, at the direction of law enforcement, CS-1 met with JOSE MARTINEZ-RENTAS in the Bronx, New York. CS-1 was equipped with a recording device during the meeting, and I and other law enforcement officers conducted surveillance during the meeting. Based on my observations on surveillance, and my debriefing of CS-1 after the meeting, I have learned, among other things, in substance and in part, that JOSE MARTINEZ-RENTAS and CS-1 discussed the robbery planned for the following day, and how JOSE MARTINEZ-RENTAS was going to bring his brother to participate in the robbery.

16.     On or about July 25, 2018, there was a series of calls between ROBERT PENA, a/k/a "Chapi, the defendant, and CS-1, between JOSE MARTINEZ-RENTAS, a/k/a "El Bori," the defendant, and CS-1, and between NELSON ALMANZAR, a/k/a "Hormiga," the defendant, and

---

[5] I have not yet reviewed the recording of this call.
[6] I have not yet reviewed the recording of this meet.
[7] I have not yet reviewed the recording of this call.

7

CS-1. These calls were recorded.[8] Based on my discussions with CS-1, I know that, during the calls with PENA, among other things, in substance and in part: (1) CS-1 and PENA spoke about the planned robbery, and how everyone was mad at PENA because he was not available the prior day; (2) PENA stated that he would be participating in the robbery because it was his job and he had put it together; and (3) PENA and CS-1 made a plan to meet up for the robbery later in the day. Based on my discussions with CS-1, I know that, during the calls with JOSE MARTINEZ-RENTAS, among other things, in substance and in part: (1) JOSE MARTINEZ-RENTAS and CS-1 discussed whether PENA was going to participate in the robbery; (2) JOSE MARTINEZ-RENTAS told CS-1 that he was going to bring his brother to participate in the robbery; and (3) JOSE MARTINEZ-RENTAS and CS-1 made a plan to commit the robbery later in the day. Based on my discussions with CS-1, I know that, during the calls with ALMANZAR, among other things, in substance and in part, ALMAZAR agreed to meet up later in the day to commit the planned robber, and indicated that he was going to be driven by another individual ("UM-2").

17. On or about July 25, 2018, at the direction of law enforcement, CS-1, who was driving, picked up ROBERT PENA, a/k/a "Chapi," the defendant, at a location in the Bronx. CS-1 was equipped with a recording device, and I and other law enforcement officers were conducting surveillance. Based on my observations on surveillance, and my debriefing of CS-1 I know the following:[9]

   a. At PENA's direction, CS-1 drove to PENA's home, where PENA went inside for a short time before returning the car. CS-1 and PENA then drove to pick up JOSE MARTINEZ-RENTAS, a/k/a "El Bori," and ANDRES MARTINEZ-RENTAS, the defendants. ANDRES MARTINEZ-RENTAS had a gun on him, which CS-1 observed, and CS-1 asked, in substance and in part, ANDRES MARTINEZ-RENTAS to put the gun in the trunk of the car, which he did. JOSE MARTINEZ-RENTAS stated, in substance and in part, that he was waiting for his gun and he made a phone call to another individual who was supposed to be bringing the gun. JOSE MARTINEZ-RENTAS then walked away to meet the other individual, and CS-1, PENA, and ANDRES MARTINEZ-RENTAS followed shortly thereafter in the car. They picked up JOSE MARTINEZ-RENTAS, who was holding an object wrapped in a piece of clothing, which CS-1 believed to be a gun. JOSE MARTINEZ-RENTAS put the apparent gun in the trunk of the car, in the same bag where ANDRES MARTINEZ-RENTAS had put his gun.

---

[8] I have not yet reviewed the recordings of these calls.
[9] I have not yet reviewed the recording of this meet.

b. CS-1, PENA, JOSE MARTINEZ-RENTAS, and ANDRES MARTINEZ-RENTAS then went to another location, the parking lot of a store (the "Store"). During the course of these events, CS-1 had several phone calls with NELSON ALMANZAR, a/k/a "Hormiga," the defendant. These calls were recorded.[10] In sum and substance, ALMANZAR was unable to reach the person who was going to drive him to the robbery, so ALMANZAR reached out to another individual to do so. In addition, in substance and in part, ALMANZAR asked CS-1 if he needed to bring a firearm, and CS-1, at PENA's direction, told ALMANZAR that he did not need to bring a firearm. ALMZANZAR then arrived at the Store in a Honda Odyssey (the "Odyssey") driven by another individual ("Individual-1"). ALMANZAR then met with PENA, JOSE MARTINEZ-RENTAS, ANDRES MARTINEZ-RENTAS, and CS-1. During that meeting, among other things, in sum and substance, they agreed that (1) ALMANZAR and PENA would take the kilograms of heroin and cocaine from the backseat of the truck when it arrived; and (2) JOSE MARTINEZ-RENTAS and ANDRES MARTINEZ-RENTAS would hold the individuals in the truck at gunpoint.

c. JOSE MARTINEZ-RENTAS and ANDRES MARTINEZ-RENTAS then went into the trunk of the car driven by CS-1 to obtain their firearms, and JOSE MARTINEZ-RENTAS, ANDRES MARTINEZ-RENTAS, PENA, and ALMANZAR got into the Odyssey driven by Individual-1, and left to go to the location where the truck was supposed to arrive.

18. I and other law enforcement officers then pulled over the Odyssey. Individual-1 was driving, NELSON ALMANZAR, a/k/a "Hormiga," the defendant, was sitting in the front passenger seat. ROBERT PENA, a/k/a "Chapi," the defendant, was sitting behind the front passenger seat, and ANDRES MARTINEZ-RENTAS, the defendant, was sitting behind the driver. JOSE MARTINEZ-RENTAS, a/k/a "El Bori," the defendant, was sitting in the third row. All five men were arrested, and I located a firearm under the seat which had been occupied by ANDRES MARTINEZ-RENTAS, and a firearm wedged between the third row seat, which had been occupied by JOSE MARTINEZ-RENTAS, and the side of the car.

19. The Odyssey was brought by law enforcement officers to the NYPD Evidence Collection Team ("ECT"). An ECT officer (the "ECT Officer") then recovered the firearms from the Odyssey. I know, from my review of the paperwork prepared by the ECT Officer, that the gun under the seat occupied by ANDRES MARTINEZ-RENTAS was a loaded Colt .38 special revolver, and the gun wedged between the third row seat, which had been occupied by JOSE MARTINEZ-RENTAS

---

[10] I have not yet reviewed the recordings of these calls.

9

and the side of the car, was an unloaded Glock 43 9 millimeter handgun.

WHEREFORE, deponent prays that ROBERT PENA, a/k/a "Chapi," JOSE MARTINEZ-RENTAS, a/k/a "Bori," NELSON ALMANZAR, a/k/a "Hormiga," and ANDRES MARTINEZ-RENTAS, the defendants, be imprisoned, or bailed, as the case may be.

_____
OSCAR RIVAS
Task Force Officer
Drug Enforcement Administration


Sworn to before me this
26th day of July, 2018

_____
THE HONORABLE JAMES L. COTT
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK